THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ROGER W. PERRIN, Appellant.

First Department, December 7, 1928.

*Godfrey Goldmark* of counsel [*Wilbur L. Ball, Ralph F. Colin* and *George K. Hourwich* with him on the brief; *Goldmark, Bennitt & Colin,* attorneys], for the appellant.

*Felix C. Benvenga, Assistant District Attorney,* of counsel [*Thomas B. Dyett, Deputy Assistant District Attorney,* with him on the brief; *Joab H. Banton, District Attorney*], for the respondent.

FINCH, J.   In seeking to set aside a judgment convicting him of grand larceny in the first degree, this defendant urges that the verdict was against the weight of the evidence and that certain so-called errors were made upon the trial.   A careful reading of this record shows a preponderance of evidence against the defendant, considering alone his own story on the stand, and leaving out of account the other weighty evidence against him, so that any errors relied upon must be disregarded.   (Code Crim. Proc. § 542.)

The record in brief shows a man well versed in speculation taking the last cash of two trusting women and using it not for speculative investment purposes, but upon his own living expenses. Let us first examine some of the salient features of the testimony out of defendant's own mouth, and then consider the errors relied upon.   Before so doing, it is pertinent to note how the defendant, through his attorney, endeavored to state to the court his defense. At the conclusion of a long colloquy, in which the attorney was endeavoring to make clear to the court the defense, he said as follows: " The contention of the defendant in this case is — which I thought I pointed out when I opened the case to the jury — that when this money was paid, Mrs. Gross was friendly with this defendant.   He asked her for a thousand dollars.   He said, ' I need a thousand dollars for personal uses,' and they discussed the question of other investments, and Mrs. Gross told Mr. Perrin that she wanted him to get speculative stocks and bonds for the balance of the four thousand dollars.   The Court: For her?   Mr. Kuzmier: For her, yes.   Now, during a period of many months after that, Mr. Perrin would call up and see Mrs. Gross and tell her, ' I have not bought anything that you are sure of making money on, anything reasonably sure.'   Mrs. Gross was friendly with him, and he would say, ' I would like to borrow some more of that four thousand dollars,' and she said, ' Go ahead and use it, go ahead and use it — go ahead and use it,'— until the four thousand dollars was used up."

The defendant, upon direct examination, stated: " When Mrs. Gross handed me the check — when Mrs. Linde handed me the check she said, ' You can use all or any part of that, but this is not a gift, as you understand.   If you make money with this

amount of money we get the profits and if you can legitimately prove that you have invested for our account these funds and lose them, we will not hold you responsible for the loss.' " So that, according to the defendant's own direct story, he received the $4,000 in question upon a trust. Upon cross-examination defendant testified (the testimony is not consecutive): " Q. We know that. Now, you got this $5,000 on the 20th of July, and when did you spend it? A. I think I told them about the middle of October that it was all gone, on November 1st, when they asked me if they could have some money * * * Q. If it was given to you as a loan, why did she mention the investment of $5,000 for speculative purposes? A. If I came across anything that was better than the stock in R. Perrin that they invested. Q. They invested in R. Perrin? A. Yes. * * * Q. And they told you they wanted more money than they were getting out of the ordinary returns? A. If I should find such investment. Q. So they invested in you? A. Yes. * * * Q. You used the $1,000 the first couple of days and you went to their home within about two weeks and they told you you could use it? A. The balance was mine anyway, but I talked it over with them. * * * Q. But you do remember definitely and distinctly and unquestionably that you went back to the Grosses and told them each time that you used more money of that $5,000, and when the whole of $5,000 was gone? A. I told them when the whole $5,000 was gone."

And yet, considering the money from the point of view of a loan, the defendant testified that there was no time for repayment and no interest charged. " Q. How much interest did you pay in the last two or three years on the $5,000, if it was invested in you?' * * * A. How much interest I paid? Q. Yes, on the $5,000? A. There was no question of any interest there. Q. You said it was an investment in you? A. That is true. Q. And you held that money and never paid them any interest? A. (No answer.) ' * * * Q. Well, when they suggested this loan of $5,000, was anything said about the time it was to be repaid? A. No. * * * Q. What did you do with the money when you used it? * * * A. I could not answer that, Miss Rothenberg. I don't know. Q. You don't know? Did you throw it out in the street? A. I spent it. Q. How did you spend it? A. I don't know. * * * Q. Never mind the ' if.' Did you speculate in that time? A. I don't remember. Q. And you don't remember whether you earned any money in that time? A. No. Q. And you don't remember what you spent this money on? A. General living expenses, I should imagine. * * * Q. Do you spend on an average of $5,000 every three or four months? A. Yes, some-

times.  \*  \*  \*  Q. You would use your judgment, to get some good rising stock that you considered safe. Wasn't that the condition under which you got the $5,000? A. At the time I explained to them that the money was gone, that ended that commission. It was then on the basis of a straight loan, and I was to return the money to them."

And yet, when the defendant made $25,000 a year, he lived up this amount between December, 1925, and June, 1926, purchased an $1,800 car, and did not seek to make good to these women because, in his opinion, they did not need the money. " Q. Yes, you are right. So from November or December, 1925 to June, 1926 you had already disbursed all your $25,000? A. I had. \* \* \* Q. You got $1,800 for the car? A. Yes. Q. Was that more important to you than the obligation that you owed to this woman? A. They did not need the money at the time." Without objection and exception and as bearing upon the issues, it also fairly appears in this record that the defendant reduced the complainant and her daughter to penury. The issue in the case was peculiarly one for the determination of a jury.

The appellant urges certain main reasons why the verdict is against the weight of the evidence, first the fact that the complainant drew the check payable to bearer. The force of this fact, however, is completely negatived by the direct testimony of the defendant, quoted above and reiterated again and again in the record, that the money when first received by him was received upon trust, and that only later did he obtain permission from the complainant to use the money for his own needs.

Again the appellant urges that when the complainant appealed to the district attorney, she first complained, not of the transaction in the case at bar, but of others. This is true, but a sufficient reason appears in the record, for the other derelictions of the defendant of which the complainant complained, were apparently more flagrant and more pressing. The defendant had converted into cash property of the complainant and was using the same for his own purposes when complaint to the district attorney halted the peculations and compelled him to make restitution.

The appellant further urges that the verdict of the jury was the result of prejudice and bias engendered by the district attorney. Space does not permit the answer to be set forth to each objection upon this ground. Suffice it to say that whenever his attention was called to the matter, the trial court was most scrupulously careful to reiterate again and again the direction to the jury to disregard the prejudicial matter. Complaint is likewise made that the trial court erred in entering into the cross-examination at too

great length and in engaging in colloquy which prejudiced the defendant's position. Despite the limited role permitted to a trial judge in the State courts, he still has the right of cross-examination, and counsel for the defendant may by objection and exception and requests to charge correct erroneous statements. It is moreover submitted that a reading of this record as a whole shows that any so-called errors which may be culled from this trial extending over several days, sink into insignificance, particularly when considered in the light of the defendant's own testimony.

Great weight is placed by the appellant upon the so-called error in excluding a question asked of a witness concerning the hostility of the witness Moran. " Q. Now, can you tell us whether or not Mr. Moran's attitude to Mr. Perrin was friendly or otherwise? " As the question called for an opinion, it was properly objected to. But assuming that the court by his colloquy sufficiently indicated a refusal to permit a proper question along the same line, this would only go to discrediting Moran's testimony because of bias, and Moran's testimony may be entirely disregarded and the defendant proven guilty beyond a reasonable doubt by the remaining testimony.

It follows that the judgment and order appealed from should be affirmed.

Dowling, P. J., Merrell and McAvoy, JJ., concur; Proskauer, J., dissents.

Proskauer, J. (dissenting). The defendant's conviction for grand larceny rests squarely upon the jury's determination of what occurred at the interview at which the $5,000 check payable to bearer was given to the defendant by Mrs. Gross. It was the defendant's contention that of this money $1,000 was an absolute loan to him and that the remaining $4,000 was also a loan, though affected by his promise to speculate with it for the benefit of Mrs. Gross, giving to her the profit. The defendant also contended that during a period of several months he informed Mrs. Gross from time to time that he had not speculated with the money and secured her permission to use it, being always bound to repay it to her. Such a transaction is, of course, unusual, but not improbable in the light of the relations between the parties. The version of the agreement given by the complainant is to me incredible. She claims that the $1,000 was a loan which was to be repaid within a few days and the whole $5,000 was then to be applied to the purchase of five named high-grade investment bonds. I do not credit this story for the following reasons:

*First*, the complaining witness was accustomed to buying securities

from a reputable brokerage firm by whom the defendant was employed. She had never before given a check to the defendant payable to bearer or to him. If she really desired to buy five high-grade bonds, there was no reason whatever for handing the defendant a check payable to bearer.

*Second,* her credibility is fatally impeached by the facts connected with the production of an alleged memorandum containing the names of these five bonds, which she said she had prepared at the time the check was given. On cross-examination she stated that her reason for doing this was because she had not received the securities. Of course she did not know at the time she gave the check that she was not going to receive the securities, and we find on further examination of the testimony that the witness Moran, who was subsequently called in to advise the complainant, prepared the original of this memorandum and actually placed upon it the names of five bonds which the complaining witness already owned and which she had purchased from the defendant's employers previous to the transaction here involved.

*Third,* no action of any kind was taken by the complainant against this defendant for over five years. Yet she testified, not once but many times on her cross-examination, that she had lost confidence in him within one year after the transaction. She was pressed to explain why if this were true she had thereafter bought thousands of dollars worth of securities through him, given him control and dominion over substantial portions of her property, and exhibited further unmistakable evidences of complete confidence in him. It is clear from the record that when pressed upon this point the complainant collapsed physically and court was adjourned. The next day the complainant changed her testimony completely and placed the date of her loss of confidence in the defendant two years later, stoutly maintaining that she had made this change without consultation with any one. I find that incredible and I find also that her conduct during the years after she said she had lost confidence in the defendant was wholly inconsistent with her claim that she had been defrauded by him.

*Fourth,* when after a lapse of about five years she finally consulted counsel and complaint was made to the district attorney regarding the defendant, not a word was first said about the particular transaction upon which this charge is predicated; complaint was made only as to other transactions.

It follows that there was here presented to the jury a close factual question. Moreover, a jury might have some difficulty in distinguishing between the defendant's admitted civil liability for the return of this money and his criminal responsibility for larceny.

The case was one which required peculiarly a dispassionate and logical trial. The complainant was an old lady and her loss would naturally be a subject of concern to a jury and any substantial error would be serious.

The learned trial court erred in cross-examining the defendant at great length and in engaging in constant colloquy, which seriously prejudiced the defendant's position, and which is challenged at times by specific exception. Typical of this is the court's comment concerning the testimony sought to be elicited of confidential relations and transactions between the parties subsequent to the giving of the check. The defendant's theory, of course, was that these transactions tended to show the improbability of the complainant's version of the original transaction. For that purpose he sought to elicit from one of the partners in a brokerage firm which employed the defendant the amount of business that was transacted by the complaining witness with that firm during the period of the defendant's employment with the firm. The court excluded the testimony over the exception of the defendant, saying, " The issue you are to meet is whether or not these bonds were bought. She admitted that there was a relationship that extended for a period even after the order for the purchase of these stocks was given, and then after she found out that he did not buy them, she still dealt with him. That is not disputed. That is admitted. You are merely going into an issue which has no relevancy. I sustain the objection." The defendant was not required to rest upon the admissions made by the complainant. He had a right to prove subsequent transactions in order to show the degree of improbability which he claimed arose from the variety and extent of these transactions. Moreover, when evidence of this character was earlier sought to be elicited in the testimony of the witness Shields, the running colloquy between court and counsel extended over many pages of the record. The court minimized the importance or relevance of testimony of this character with comment, of which this is typical: " You cannot wander over a period of five years when you have a direct issue to meet, and that issue is, did he, or did he not buy those bonds for the complainant." In fact that was not the issue at all. It was conceded that the defendant had not bought the bonds. His defense was that he was under no legal obligation to buy them. These exceptions alone in my opinion require a reversal.

It was also error to exclude the testimony of the witness Clow as to the hostility and bias of the witness Moran. While it is true that the specific question excluded may have been formally inartificial, the ruling of the court was not placed upon that ground,

but squarely on the ground that the witness Moran was not the complainant and that, therefore, his animus was not germane to the issue. This ruling was prejudicial error.

The verdict rendered by the jury is in my opinion against the weight of evidence and was induced by specific reversible error.

For these reasons I dissent from the affirmance of this judgment and order.

Judgment and order affirmed.