THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN F. KELLER, Appellant.

Fourth Department, April 6, 1979

154

APPEARANCES OF COUNSEL

*Nathaniel A. Barrell (Anna Marks* of counsel), for appellant.

*Edward C. Cosgrove, District Attorney (John De Franks* of counsel), for respondent.

## OPINION OF THE COURT

WITMER, J.

■ Upon an indictment for assault in the first degree and criminal possession of a weapon in the fourth degree defendant was convicted, after jury trial, of the lesser included crime of assault in the second degree and also of criminal possession of a weapon in the fourth degree. He was sentenced on the assault count to an indeterminate term of imprisonment with a maximum of seven years and to one year on the weapon count, to run concurrently. On this appeal he asserts that improper conduct of the prosecutor and undue questioning of an alibi witness by the Trial Justice deprived him of a fair trial, and we agree. Additionally, he claims that the sentence imposed was excessive.

At about 1:00 A.M. on July 12, 1977 Earl Thompson was found lying on a bed that was soaked with his blood, emanating from his slit throat. This was in a second floor flat at No. 217 Maurice Street in the City of Buffalo. Mrs. Dunsmoor was a tenant in this flat and her two sons, Pat and James Devine, lived there with her; and for a few days or weeks prior to the incident, Earl Thompson also lived there. The only person who later gave testimony implicating defendant in the attack on Thompson was James Devine, and the evidence of the latter's presence at the time of the crime was the basis of the defense that he, not defendant, was the guilty person.

The testimony developed the following scenario: On the morning of July 11, 1977 Mrs. Dunsmoor and her friend, Donna Endridge, started drinking alcoholic beverages in her flat, and they were soon joined by Earl Thompson, Bill Geary and John F. Keller, the defendant. They continued to drink throughout the day and evening. At about midnight Mrs. Dunsmoor and Donna left to go to a bar. At that time, according to Mrs. Dunsmoor, her son James was sitting at the

table with defendant. Geary had "passed out" and was asleep on the floor, and Thompson was asleep in the bedroom. When Mrs. Dunsmoor and Donna returned from the bar about an hour later, Geary was still asleep on the floor and Thompson was on the bed but his throat had been cut and he had bled profusely, so that the bed was covered with blood. They acted at once to attend to Thompson, and they aroused Geary to call the police. The police arrived shortly and called an ambulance. Mrs. Dunsmoor testified that she observed no argument or fighting between Thompson and defendant that evening.

Thompson was taken to a hospital where he was treated for a wound three inches deep in the front of his neck and for several superficial cuts in his abdomen. He remained in the hospital for seven days, during four of which he was under intensive care. The neck wound created a substantial risk of his death, but he recovered and testified at the trial.

He testified that he, Geary and defendant were drinking in the apartment that afternoon, and in the early evening they went to a liquor store and got two quarts of wine and drank one of them on the way home; that during that time defendant showed him a knife which had a blade four or five inches long, but there was no argument or fighting between them. After returning to the flat, they continued to drink. Soon Mrs. Dunsmoor and Donna left to go to a bar, and he went to bed. He acknowledged that he may have been in a drunken stupor after 9:00 P.M. and he recalls nothing thereafter until he woke up in the hospital. He noted that nothing was stolen from him during the incident that night.

Defendant's sister, Florence Keller, lived in the flat beneath Mrs. Dunsmoor and she testified on behalf of defendant. She had been in the Dunsmoor flat for a while that evening and saw defendant sitting at a table with Thompson and Geary. She returned to her apartment and after 12:30 A.M. she heard sounds of a fight in the flat above, of something falling and of moaning and someone running down the stairs. She went to her window, near the porch, and saw James Devine jump off the porch, holding a long knife in his right hand. She testified that she was frightened and did not go upstairs until called up later by Donna. At that time, she said, Geary was still asleep on the floor and Donna and Mrs. Dunsmoor were attending Thompson in the bedroom; and that as she left the flat, James Devine returned home and told her that he did not know what

had happened. She further testified that she had seen defendant leave the flat shortly after 10:00 P.M.

Geary testified and confirmed that the group had been drinking all afternoon and evening on July 11 and that there was no argument or fighting between Thompson and defendant. He testified that he saw no knife in defendant's possession and that defendant left to go to a tavern about 10:00 P.M.

James Devine testified that he came home at about 5:30 P.M. on July 11, when only his mother, Mrs. Dunsmoor, and Donna were there, and he left after 20 minutes and did not return until 12:30 A.M. that night. At that time Mrs. Dunsmoor, Donna, Thompson, Geary and defendant were there drinking in the kitchen. He also stated that the women and defendant were sitting at the table, Geary was leaning against the counter and Thompson was lying on the bed. His mother told him to eat a sandwich and go to bed, and he did. His mother and Donna were then about to leave; and by that time Geary was asleep on the floor. Shortly thereafter he heard hollering and moaning, and he went to the dining room and saw defendant standing beside the bed on which Thompson lay, and "there was blood all over the place". Defendant came out of the bedroom and said to Devine, "If you say anything to anyone, the same thing will happen to you". Defendant then went into the kitchen and wiped the knife on a shirt belonging to Devine that was hanging there. Devine testified that he then left the house to find his mother, and was too scared to use the telephone. He checked two bars, looking unsuccessfully for his mother. He then returned home and found his mother and Donna there attending to Thompson, and defendant was not there. When the police came, Devine did not tell them who attacked Thompson until they threatened to give him a lie detector test. He stated that at no time did he see Thompson and defendant argue or fight.

At the conclusion of the cross-examination of defendant's sister, Florence Keller, the Trial Justice questioned her at some length. She testified that after Donna called her to the upstairs apartment she, Florence, only stayed there a few minutes. She saw the police and ambulance come. Nobody came to her apartment to ask her questions, and she volunteered no information. She only learned from the newspaper that her brother had been arrested for assaulting Thompson, but she did not tell the police what she saw James Devine do that night. She testified that when she saw Devine on the

porch as he returned home that night she told him that she saw him come down the stairs and jump off the porch with a knife in his hand; but she never told anyone else that, not even the defense attorney, until she testified at the trial, because she feared for her life and the lives of her children.

Defendant testified in his own defense. He confirmed that he was in Mrs. Dunsmoor's flat on the afternoon and evening of July 11, drinking with her and Donna, Thompson and Geary, and confirmed the trip to the liquor store with Thompson. He stated that after that he remained in the flat two or three hours until a little after 10:00 P.M. when he went to Kelly's Inn, where he met a friend, Ricky La Rue; and he remained at the inn until 3:30 A.M. when he went home alone. He knew no one at the inn except Ricky and the bartender. For some months during that period he had met Ricky at that bar nightly; he knows where Ricky lives; but he has not seen him lately. Ricky was not called as a witness. Defendant stated that he and Thompson were good friends, and that Thompson bought the wine on July 11. Defendant had never talked with his sister about this incident. His attorney told him that she was going to testify but he did not know what she was going to say. He denied having any fight with Thompson on the night of July 11-12.

Defendant's first contention is that the conduct of the prosecuting District Attorney denied him a fair trial. He points especially to the following conduct of the prosecutor: On cross-examination of Florence Keller the prosecutor addressed her thus: "Mrs. Keller, before going any further, I would like to give you an opportunity, if you want to, that if there is anything you have testified to, that you want to change that maybe is exaggerated on or you lied about—". Defendant's objection to the statement was sustained. At the close of Ms. Keller's testimony the prosecutor moved to strike her testimony "as being [as] a matter of law totally unbelievable". On summation the prosecutor made the following statements concerning Ms. Keller's testimony: "She has got a motive to lie, it is her brother. It is pretty tough. I don't know if I can come on that hard as a prosecutor, except, she is defiling the system of justice which I am sworn to participate in * * * This system has to work. She took that stand and she just lied. Now, if you feel differently, please be honest. That is my gut reaction, but I couldn't believe it". Further, "If you listen to that woman testifying, if you listened and use your

good common sense, that woman was filled with so much bitterness, hatred, resentment, that she would have told us that this building is located in Miami, Florida. Did she do it to get her brother off? * * * If that woman was believable, I think I better have my values reevaluated". No objection was made to these statements by defense counsel.

■ "The expression by a prosecutor of his personal opinion of the witnesses' credibility is improper." *(People v Petrucelli,* 44 AD2d 58.) Yet, "[w]hile a prosecutor may not make himself an unsworn witness and attempt to bolster his case by stating that he believes certain testimony and does not believe other testimony *(People v Lovello,* 1 NY2d 436), the remarks complained of must be considered in the light of * * * the weight of the evidence against the defendant *(People v Brosnan,* 32 NY2d 254)" *(People v De Cristofaro,* 50 AD2d 994).

■ The People concede on this appeal that the statements by the prosecutor were "wholly improper" but contend that defendant suffered no prejudice thereby. It is true that the court, in its opening statement and in its charge, informed the jury that it was the jury's responsibility to evaluate a witness' testimony. This, however, does not constitute sufficient curative instruction to correct the egregious errors above quoted. Furthermore, the evidence of defendant's guilt is not overwhelming, being exclusively based upon circumstantial evidence stemming from James Devine's testimony. Error of this sort, in the absence of further prejudicial error, is not generally ground for reversal, but the cumulative effect of this conduct and of other errors discussed later herein mandate reversal (see *People v Shanis,* 36 NY2d 697, 699; *People v Kyser,* 52 AD2d 1072; *People v Dunnett,* 44 AD2d 733, 734; *People v Petrucelli, supra).*

■ ■ In his summation the prosecutor made the following remarks: "See, the People in presenting a case, can't bring in evidence to bolster our own evidence. In other words, I couldn't bring in Detective Grabowski, who is the detective involved, to say that I threatened the boy with a lie detector test and then when *[sic]* we came to the truth, that would be bolstering. I couldn't have brought in people from the bars who saw Jimmy Devine running around, because that would bolster my witness and I am prohibited from doing that." Although defendant did not object to this statement he contends that the prosecutor placed facts not in evidence before the jury. The People again concede "the impropriety of the

prosecutor's gratuitous summation comments, indicating, without evidentiary basis, that there existed proof tending to corroborate the testimony of witness James Devine". The People contend, however, that this misconduct is balanced by statements by defense counsel which were unsupported by the evidence. While it is true that the prosecutor's misconduct should be considered in respect of defense counsel's comments, nevertheless grossly improper remarks by a prosecutor may not be justified on the ground of improprieties in the summation of defense counsel *(People v Matthews,* 33 AD2d 679; *People v Bowen,* 32 AD2d 926). "It is fundamental that the jury must decide the issues on the evidence, and therefore fundamental that counsel, in summing up, must stay within 'the four corners of the evidence'. * * * Thus the District Attorney may not refer to matters not in evidence." *(People v Ashwal,* 39 NY2d 105, 109-110.) The improper statement by the prosecutor in bolstering his main witness' testimony by stating in summation what certain people could testify to if called cannot be excused as harmless error (see *People v Wright,* 41 NY2d 172, 175; *People v Thomas,* 43 AD2d 547, 548).

■ Defendant further contends that the following comments made by the prosecutor in summation were improper and inflammatory: "If that is where the violence is, then that is where we have to stop it * * * No, because Earl Thompson and all these people are a bunch of drunken bums, doesn't mean that violence should be allowed to exist in our society. Really, what we are talking about is good common sense and let's stop all this violence." Further, "above them and below them we are dealing with violence and violence has to be stopped and you don't let people off from violence because they are in an unfortunate set of circumstances. That is one of the problems in our American society * * * It has got to be stopped and this is where it does get stopped."

■ ■ " 'While allowed the widest latitude by way of comment, denunciation or appeal in advocating his cause, this does not give [the prosecutor] any warrant to introduce into summation matter which the jury had no right to consider in determining the guilt or innocence of the defendant' " *(People v Adams,* 21 NY2d 397, 402). "Above all he [the District Attorney] should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions

which have a decided tendency to prejudice the jury against the defendant" *(People v Ashwal,* 39 NY2d 105, 110, *supra).*

█ The comments by the prosecutor, while certainly beyond the bounds of proper advocacy, would not separately, in and of themselves, mandate a reversal. However, the cumulative effect of these and other errors must be considered on the record as a whole. As noted by the court in *People v Ingram* (49 AD2d 865), "The above enumerated errors are such that taken in conjunction they patently deprived defendant of a fair trial as a matter of law" (see, also, *People v Shanis,* 36 NY2d 697, *supra; People v Kyser,* 52 AD2d 1072, *supra).* Although no exception was taken by defense counsel to the above errors, nevertheless, in the interest of justice, the circumstances warrant excusing defendant's failure to except, because the proof of guilt is not overwhelming and the errors relate to essential elements of the People's case and of the defense *(People v Kelly,* 12 NY2d 248; *People v Jones,* 32 AD2d 1069, affd 27 NY2d 501, cert den 400 US 994; CPL 470.15, subd 3, par [c]; subd 6, par [a]).

Defendant further contends that the extensive examination of his sister, Florence Keller, by the Trial Justice also deprived him of a fair trial. As noted above she was witness to defendant's alibi that he had left the flat shortly after 10:00 P.M. and hence was not there when the crime occurred; and she had given testimony tending to place the blame for the assault on James Devine, not defendant. At the conclusion of her cross-examination by the prosecutor, the court questioned her. Because her answers were not in direct response to his questions, the court said, "I am not going to take all this jibber jabber from you * * * Please, just answer the question and don't give us all this jibber jabber". The court then questioned her about her alibi testimony and elicited that she had not disclosed the alibi to the police or to anyone, including defense counsel, prior to testifying that day. The court ignored an attempt by defense counsel to interrupt the questioning, and continued its questions. The examination emphasized to the jury the issue whether her alibi testimony was fabricated, and it seriously undermined her credibility.

██ Cross-examination of an alibi witness by a prosecutor as to whether he previously reported his information to the police or the District Attorney is dangerous and usually constitutes ground for reversal, because "an alibi witness has no obligation to come forward and contact the police or the

District Attorney; such silence by an alibi witness may not be used as a means of discrediting the witness, either upon cross-examination or during the People's summation" *(People v Smoot,,* 59 AD2d 898, 899; see, also, *People v Dale,* 65 AD2d 625; *People v Lindsay,* 61 AD2d 992; *People v Mims,* 59 AD2d 769; *People v Hamlin,* 58 AD2d 631). While agreeing with this principle *(People v Maschi,* 65 AD2d 405; *People v Conyers,* 65 AD2d 437), the First Department has held in *People v Brown* (62 AD2d 715, 720), that "whether the alibi was only recently disclosed is a factor a jury should consider in assessing the weight to be given to the testimony of such a witness." The court concluded that the questioning of an alibi witness concerning when he first disclosed such information was relevant on the issue of fabrication and credibility. We agree with this view and find it applicable here, especially with respect to the questions whether the witness had disclosed the substance of her testimony "to anyone" and, if to anyone, when was such disclosure first made. Accordingly, had such questions been asked by the prosecutor, we would have found no error therein.

In this case, however, the issue of fabrication by the alibi witness was explored not by the prosecutor on cross-examination, but by the court, supplementing the cross-examination. "That * * * the questioning might well have been proper cross-examination had it been conducted by the prosecuting attorney is beside the point * * * The prosecution of the case on behalf of the People was the responsibility of the Assistant District Attorney who had been assigned to the matter. It is not for the Trial Justice, no matter how well motivated, to usurp the role of counsel for either side in a criminal trial because of the court's conception as to how the case should be presented" *(People v Ellis,* 62 AD2d 469, 471). In *People v Moulton* (43 NY2d 944, 945) the court said:

"The role of a Trial Judge in a criminal case is not merely that of an observer or even that of a referee enforcing the rules of a game (see *People v De Jesus,* 42 NY2d 519, 523). In fulfillment of its broader obligation to ensure the defendant a fair and impartial trial *(People v Crimmins,* 36 NY2d 230, 238), a court is not without power, to be exercised with judicious restraint, to keep the proceedings within the reasonable confines of the issues and to encourage clarity rather than obscurity in the development of proof (see *People v*

*Knapper,* 230 App Div 487, 489-490; *People v Perrin,* 224 App Div 546, 550, affd 251 NY 509).

"For these purposes, the court may put appropriate questions to the witnesses and, of course, make such rulings, evidentiary and otherwise, as the proper conduct of the case and the range of discretion entrusted to it for that purpose require. But it goes without saying that these functions must not be carried out in language and in a manner from which a jury will gain the impression of existence of an opinion on the part of the court as to the credibility of the testimony of any witness or the merits of any issue in the case *(People v Carter,* 40 NY2d 933, 934; *People v Budd,* 38 NY2d 988; *People v Mendes,* 3 NY2d 120; *People v Ohanian,* 245 NY 277)." (See, also, *People v Congilaro,* 60 AD2d 442, 456-457.)

The Trial Justice also questioned the witness about her seeing James Devine, the description of the knife in his hand, and her later confronting him. The court clearly interjected himself into the proceedings, improperly by examining the defense witness with "prosecutorial zeal" *(People v Harris,* 44 AD2d 809). The court conveyed the impression that it did not believe Ms. Keller's statement that she saw James Devine leaving the house with a knife in his hand. More significantly, however, the court pursued a line of questioning not followed by the prosecutor, whereby the court attempted to establish, and did so with great success, that Ms. Keller's alibi testimony was a recent fabrication. The court not only seriously attacked Ms. Keller's credibility but also effectively destroyed the only defense raised by defendant, to wit, his alibi defense. This was not a case merely of attempting to clarify testimony with respect to a particular issue. The court went far beyond the prosecutor's cross-examination of the witness and undercut the alibi defense raised by defendant. "It is sufficient to conclude, in this setting where there were sharp issues of credibility * * * that * * * the casting of a pall of suspicion over [defendant's] case and the interjection of extraneous considerations unfairly burdened the defendant with the obligation, not only of rebutting the proof of the People, but also of countering the implications imputed by the court. Under these circumstances, the error cannot be disregarded as harmless (see, e.g., *People v Williamson,* 40 NY2d 1073, 1074)." *(People v De Jesus,* 42 NY2d 519, 524.) The court's intensive questioning and examining of Ms. Keller with respect to her credibility and the merits of defendant's case "could not help

but make him appear to be an advocate rather than an impartial arbiter. It plainly and improperly conveyed to the jury the court's attitude as to the merits of the case as well as the credibility of the witnesses" *(People v Ellis,* 62 AD2d 469, 470). The court thus assumed the function of prosecutor to such an extent that it deprived defendant of a fair trial and impaired the requisite aura of impartiality (see *People v De Jesus,* 42 NY2d 519, *supra; People v Ellis,* 62 AD2d 469, *supra; People v Setaro,* 44 AD2d 847; *People v Harris,* 44 AD2d 809, *supra).*

Defendant's final contention is that the sentence was excessive. In view of the above conclusions, the sentence is of little moment. We have considered it, however, and find no fault therein.

We conclude that the improper comments of the prosecutor and the excessive examination by the trial court of the alibi witness denied defendant a fair trial. In the interest of justice, therefore, the judgment should be reversed and a new trial granted.

CARDAMONE, J. P., HANCOCK, JR., SCHNEPP and CALLAHAN, JJ., concur.

Judgment unanimously reversed, on the law and facts, and a new trial granted.