OPINION OF THE COURT
Gabrielli, J.
Following a trial by jury in the Monroe County Court, defendant Richard Lee Dawson was found guilty of the crimes of sodomy in the first degree (Penal Law, § 130.50), attempted rape in the first degree (Penal Law, §§ 110.00, 130.35), robbery in the second degree (Penal Law, § 160.10), grand larceny in the third degree (Penal Law, § 155.30) and assault in the second degree (Penal Law, § 120.05). His conviction was affirmed, without opinion, by the Appellate Division, Fourth Department. On appeal to this court, defendant now contends that his conviction should be reversed because the District Attorney improperly cross-examined a number of defense witnesses regarding their failure to come forward with exculpatory information prior to trial. The instant appeal thus requires us to consider a question which has produced a divergence of opinion among the Justices at the Appellate Divisions: whether and under what circumstances a District Attorney may use a defense witness’ prior silence as a basis for impeachment.
The charges in this case arose out of a single incident in which defendant allegedly accosted a woman in an enclosed parking lot at about 3:30 p.m. on the afternoon of April 15, 1975, forced her to perform an act of oral sodomy and, finally, drove away in her car. The car was later found by the police, apparently abandoned, in a parking lot adjacent to the building in which defendant worked. Fingerprints which allegedly matched those of defendant were found on the rearview mirror inside the automobile.
*315 The identity of the complaining witness’ assailant was the most hotly contested issue at trial. The complaining witness described her attacker as a black male, about defendant’s height with a bushy "afro” and a red tint to his hair. She also stated that he was wearing a blue, knee-length coat. A parking lot attendant who had witnessed a part of the incident testified that the man he saw driving off with the victim’s car sported a bushy "afro”, but he further stated that the man may have had lighter skin than defendant. Another witness, who attended school with defendant, stated that, on the day in question, he had seen defendant wearing a blue, knee-length jacket resembling the one described by the victim. Finally, three police officers testified that defendant had worn his hair in a bushy "afro” with a reddish tint during the spring of 1975.
Defendant, testifying in his own behalf, denied having committed the crimes charged, asserting instead that he had been at home babysitting for his foster brothers on the afternoon of the assault. This alibi was confirmed by both of his parents, who testified that defendant’s father had picked him up at about 2:30 p.m. and had driven him home that day so that he could look after his foster brothers while they went out to do some family errands. When they arrived home at about 4:00 p.m., according to defendant’s parents, they found defendant cooking and tending to his brothers, exactly as they had left him. Additional confirmation of this alibi was supplied by defendant’s aunt, who testified that she had called defendant’s house at 3:17 p.m. on April 15, 1975 and that defendant had answered the telephone at that time.
In order to offset the damaging effect of the presence of his fingerprints inside the victim’s car, defendant further testified that he and the victim had been friends for some time and had met in her car on several occasions. Neptune Bembry, an acquaintance of defendant, supported this testimony by stating that he had seen defendant and the victim together and holding hands on at least one occasion. Finally, a second parking attendant who worked at the garage where the incident occurred testified on behalf of defendant. He testified that the man he had seen driving away in the victim’s car on the day in question did not resemble defendant.
The District Attorney vigorously cross-examined each of these witnesses in an effort to shake defendant’s alibi. Among a host of other questions, each witness was asked whether he *316 or she had come forward and given the same information to law enforcement officials after learning that defendant had been arrested for the crimes charged. In each instance, the witness answered in the negative and gave some brief explanation for his or her prior silence.
Defendant now seeks to have his conviction overturned on the ground that such questioning constituted prosecutorial misconduct and a denial of his right to a fair trial. We note, however, that objection was made to the District Attorney’s questioning on cross-examination on only three occasions. On one of these occasions, the court sustained the objection. Another time, the court directed the District Attorney to rephrase the question before the witness had the opportunity to respond. On neither of these occasions did defetise counsel request a curative instruction nor otherwise express any dissatisfaction with the adequacy of the court’s ruling. Consequently, these two objections were not preserved for appellate review (CPL 470.05, subd 2). It was only during the cross-examination of defendant’s mother, Lydia Dawson, that defense counsel’s objection was overruled and the District Attorney was permitted to proceed with his line of questioning. It is this colloquy which we now have occasion to review:
"Q. Did you yourself ever go to the Grand Jury of the County of Monroe and tell them the story you told us?
"DEFENSE COUNSEL: Objection.
"A. I don’t know anything about the Grand Jury.
"THE COURT: Just a minute.
"DEFENSE COUNSEL: Objection, Your Honor. There is no legal responsibility even for the defendant or for his mother to attend the grand jury proceedings. * * *
"DISTRICT ATTORNEY: I am not asking about legal responsibilities, all I am asking [is] if she did go to the grand jury.
"THE COURT: Overruled.
"Q. You may answer.
"A. This is the first time I seen the grand jury. I don’t know anything about the grand jury.
"Q. Did you ever go to the police and tell them this story that you told us about your son’s activities on April 15, 1975?
"A. I never talked to anybody about the thing.
"Q. So today was the first time you really told your story?
*317 "A. I never got involved with the police or anything”.
Before considering the merits of defendant’s specific contentions, we deem it necessary to make some preliminary observations concerning the propriety of this type of questioning in view of the apparent conflict on the issue that exists among the Appellate Divisions. The Second Department, for example, consistently has taken the position that it is error to permit the District Attorney to question a defense witness concerning his prior silence (People v Butler, 67 AD2d 950; People v Altman, 63 AD2d 684; People v Cox, 61 AD2d 1035; People v Lindsay, 61 AD2d 992; People v Wilson, 60 AD2d 920; People v Smoot, 59 AD2d 898; People v Mims, 59 AD2d 769; People v Hamlin, 58 AD2d 631), particularly where the questioning is not followed by appropriate limiting instructions to the jury (People v Clark, 64 AD2d 669). The rationale underlying this position has been stated as follows: "The law is clear that the prosecution may not comment upon the postarrest silence of a defendant and that a defendant has no obligation, when in custody, to tell either the police or the District Attorney that he has an alibi or other exculpatory defense. * * * Likewise, an alibi witness has no obligation to come forward and contact the police or the District Attorney; such silence by an alibi witness may not be used as a means of discrediting the witness, either upon cross-examination or during the People’s summation” (People v Smoot, supra, at p 899). The First Department, on the other hand, has developed what might be termed a compromise position, holding that an alibi witness’ prior silence may be used for impeachment purposes, provided that the District Attorney does not suggest through his questioning that the witness is unworthy of belief because he breached a supposed civic duty to come forward (People v Burgos, 69 AD2d 783; People v Colarco, 68 AD2d 430; People v Maschi, 65 AD2d 405, revd on other grounds 49 NY2d 784; People v Brown, 62 AD2d 715, aifd on other grounds 48 NY2d 921; but see People v Nolasco, 70 AD2d 549; People v Milano, 59 AD2d 852). A similar approach has been adopted in the Fourth Department (People v Knox, 71 AD2d 41; People v Keller, 67 AD2d 153).
We note at the outset that we agree in principle with the general proposition, advanced in many of the Appellate Division decisions, that, absent a specific legislative directive, a citizen ordinarily has no legal obligation to volunteer exculpa *318 tory information to law enforcement authorities.[1] Indeed, even if the existence of such an obligation were compatible with our system of government, it could not form the basis of a meaningful rule of law, since the difficulties involved in enforcing the duty could prove to be insurmountable (cf. United States v New York Tel. Co., 434 US 159, 175-176, n 24). In the absence of any such legal duty, the decision whether to volunteer exculpatory information to the police regarding a particular suspect must remain a matter of individual conscience and private choice. Accordingly, it would be improper for a District Attorney to suggest through his questioning that a witness has a flawed moral character or is generally unworthy of belief solely because he or she failed to come forward prior to the trial.
It does not necessarily follow, however, that an individual’s previous silence may never be used as a basis for impeaching his testimony at trial. Whether or not a private citizen has a legal obligation to volunteer information, there exists a wide variety of situations in which the natural impulse of a person possessing exculpatory information would be to come forward at the earliest possible moment in order to forestall the mistaken prosecution of a friend or loved one. In such situations, the failure to speak up at a time when it would be natural to do so might well cast doubt upon the veracity of the witness’ exculpatory statements at trial. In effect, in these situations, the witness’ previous silence is a form of conduct that may be analogized to a "prior inconsistent statement” by the witness. As has been observed by one noted commentator, "[a] failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the nonexistence of the fact. * * * There may be explanations, indicating that the person had in truth no belief of that tenor; but the conduct is 'prima facie’ an inconsistency” (3 Wigmore, Evidence [3d ed], § 1042, p 733). And, of course, it is well established that an inconsistency in a witness’ prior conduct or statements may be used as a means of impeaching his testimony at trial (People v Wise, 46 NY2d 321; see Richardson, Evidence [10th ed — Prince], § 501).
True, we have had occasion in some of our prior decisions to *319 resort to the concept of a "duty to speak” in connection with our analysis of the admissibility of a defendant’s prior silence in the face of an accusation by law enforcement authorities. In People v Rutigliano (261 NY 103, 107), for example, we noted that a defendant’s silence while in custody cannot be used as evidence in chief at his trial because "[h]e is then under no duty to speak”. Similarly, in People v Christman (23 NY2d 429, 433), we stated that a comment in the prosecutor’s summation regarding the defendants’ failure to assert their alibi at the time of their arrest was improper because "[defendants were under no obligation when questioned after arrest to say anything or lay out an alibi” (see People v Mleczko, 298 NY 153; see, also, People v Bianculli, 9 NY2d 468; People v Travato, 309 NY 382). The use of the term "duty to speak” in these cases, however, cannot be understood without reference to its background.
At one time in our law, a defendant’s silence in the face of an accusation was, although hearsay, fully admissible against him at trial under certain circumstances as an "adoptive” or "tacit” admission (Fisch, New York Evidence [2d ed], § 792; McCormick, Evidence [2d ed], § 161; see People v Allen, 300 NY 222, 225; People v Koerner, 154 NY 355, 374). The rule was stated in Kelley v People (55 NY 565, 571) as follows: "Where an individual is charged with an offence, or declarations are made, in his presence and hearing, touching or affecting his guilt or innocence of an alleged crime, and he remains silent when it would be proper for him to speak, it is the province of a jury to interpret such silence, and determine whether his silence was, under the circumstances, excused or explained * * * [SJilence under such circumstances is but an implied acquiescence in the truth of the statements made by others, and thus presumptive evidence of guilt” (emphasis supplied).
This rule fell into disfavor, however, in part because it led to the possibility of manufactured evidence and, more importantly, because it seemed to conflict with the right of the accused to remain silent in the presence of his accusers (see Fisch, New York Evidence [2d ed], at p 462; McCormick, Evidence [2d ed], at pp 353-354; cf. Miranda v Arizona, 384 US 436, 468, n 37). Accordingly, the courts were enjoined to use extreme care to ensure that admissions by silence were used only in those circumstances in which their probative value could not be assailed on logical grounds (e.g., People v Lewis, *320 238 NY 1, 5; People v Conrow, 200 NY 356, 367; People v Cascone, 185 NY 317; People v Kennedy, 164 NY 449; People v Koerner, 154 NY 355, supra; People v Willett, 92 NY 29). Finally, in People v Rutigliano (supra, at p 107), the court adopted the so-called "Massachusetts rule”,[2] which entirely precluded the use of a defendant’s silence while in custody as evidence in chief. In so doing, the court stated (at p 107): "No cautious person, when in custody, accused of crime would care to enter into a discussion of his guilt or innocence with his captors * * * when what he said might be used against him. It cannot be said that 'the declaration was [in such circumstances] in substance a challenge to [him] to assert [his] innocence if [he] were not guilty’ * * * He is then under no duty to speak and his silence should not be counted as giving assent to what he hears. If he had counsel, he would doubtless be advised not to talk. If he had not, he should not be prejudiced thereby” (quoting Kelley v People, supra, at p 573; substitutions in original; emphasis supplied).
Although the court used the term "duty to speak” in Rutigliano, it is evident from the context that the term was used only to negate the concept advanced in Kelley that it was "proper” or "natural” for a defendant to speak under such circumstances. In effect, the notion that a defendant in custody is under "no duty to speak” was really only another way of saying that it is neither natural nor expected that he should speak when faced with his accusers and that, therefore, his silence in that context has no probative worth.[3] Indeed, our recent decision in People v Conyers (49 NY2d 174) speaks directly to this principle. In Conyers, we held that a defendant’s silence at or after the time of his arrest may not be *321 used to impeach his testimony at trial. Although we relied upon modern principles of due process in reaching that conclusion, we stressed, as an alternative rationale (id., at p 181, n 2), that a defendant’s silence in the presence of his accusers is of such low probative value that its usefulness as impeachment evidence must be deemed to be outweighed by the due process considerations which militate against its use.
The due process considerations that concerned us in Conyers, of course, have no bearing when the People seek to use the prior silence of a witness who is not involved in the crime to impeach that witness’ testimony at trial. Naturally, we remain concerned with the probative value of such silence, but, again, the analysis utilized in Rutigliano and its progeny is not pertinent. A dedendant’s silence is not probative for the simple reason that he is neither required nor expected to speak when confronted with his accusers. Moreover, the inferences which may be drawn from his silence may be highly prejudicial. The same cannot always be said for an ordinary witness who may have no personal stake in remaining silent and who, indeed, may very well have a personal interest in speaking up in order to aid the defendant. It is this interest in speaking up which, in a given case, may render the witness’ failure to do so of probative worth when used to impeach his or her testimony.
Thus, there is nothing inherently improper about cross-examining a defense witness concerning his failure to come forward at an earlier date. Assuming a proper foundation has been laid,[4] the information elicited during this type of questioning might well aid the trier of fact in its effort to determine whether the testimony of a defense witness is an accurate reflection of the truth or is, instead, a "recent fabrication”.
To be sure, there may be explanations for the witness’ prior silence which are entirely consistent with the witness’ position at trial. Some individuals, for example, may routinely avoid contact with law enforcement authorities out of an ingrained sense of fear or mistrust of officialdom (see People v Conyers, *322 49 NY2d 174, 182, supra). Others may refrain from volunteering information to the police or the District Attorney because they believe that their efforts to exonerate the suspect would be futile (see People v Colarco, 68 AD2d 430, supra [Sandler, J., dissenting]). Finally, some may remain silent because they were explicitly instructed to do so by the defendant’s attorney. That such alternative explanations for a witness’ silence may exist in a given case, however, does not provide an adequate ground for adopting a per se rule and excluding this type of questioning entirely in criminal prosecutions. As is true in any instance in which impeachment evidence is offered, the trier of fact may reasonably be expected to weigh the available information and determine for itself whether the witness’ trial testimony is consistent with his prior behavior and assertions. Just as we have recognized that there are a variety of factors which may account for the witness’ prior silence, the average juror may be expected to discern the existence of the same factors and credit or discount the witness’ testimony in accordance with his perceptions. Moreover, the witness or the party for whom he was sworn always remains free to explain the witness’ prior conduct or attempt to reconcile it with the witness’ present testimony (see Larkin v Nassau Elec. R.R. Co., 205 NY 267, 270-271). This may be accomplished either directly through the witness’ responses to the District Attorney’s questions or indirectly through questioning by defense counsel on redirect examination.
In summary, although the fact of a witness’ prior silence may be of low probative worth in many cases (cf. People v Conyers, supra, at pp 181-182), we see no sound reason flatly to prohibit this type of cross-examination of a defense witness in all criminal proceedings. Nevertheless, because the constitutional guarantees of due process of law, as well as the right to a fair trial, are implicated (US Const, 6th Arndt; NY Const, art I, § 6), we think it advisable to add a few cautionary comments. As is true with any form of cross-examination, the Trial Judge must exercise his sound discretion in cases such as this to ensure that the jury is not misled by the District Attorney’s efforts to impeach the credibility of a defense witness’ testimony (cf. People v Alicea, 37 NY2d 601, 605). Additionally, the Trial Judge should inform the jurors, upon request, that the witness has no civic or moral obligation to volunteer exculpatory information to law enforcement authorities and that they may consider the witness’ prior failure to *323 come forward only insofar as it casts doubt upon the witness’ in-court statements by reason of its apparent inconsistency. Finally, when such questioning begins, the Trial Judge should call a bench conference to ascertain whether the witness refrained from speaking under the advice of defense counsel, for in such a case examination on the issue of the witness’ postconsultation silence would be improper and could well result in a mistrial (cf. People v Conrow, 200 NY 356, 367, supra).
In a related vein, the District Attorney’s obligation to rise above mere partisan advocacy and to conduct the trial in a manner consistent with the defendant’s due process rights cannot be overlooked (see People v Steinhardt, 9 NY2d 267; People v Fielding, 158 NY 542). As a practical matter, this means that the District Attorney must act in good faith when he questions a defense witness about his prior failure to come forward. Particularly suspect are questions concerning the witness’ failure to tell the Grand Jury what he knew about the defendant’s role in the crime. The witness, practically speaking, would have had no occasion to tell his story to the Grand Jury unless he had been summoned to appear before it, and, thus, no inference could properly be drawn from his failure to speak in that context.[5] Accordingly, since the District Attorney is usually in control of the Grand Jury proceedings and is, further, aware of whether a particular witness was summoned to appear, a question by the District Attorney concerning a defense witness’ failure to speak before that body should ordinarily be considered improper if the witness was not actually called upon to appear. Of course, an isolated impropriety of this nature may be cured, in many cases, by an appropriate admonition addressed to the jury upon the request of defense counsel.[6]
*324 Turning to the facts in the instant case, we conclude that there should be an affirmance. Having laid a proper foundation, the District Attorney had the right to attempt to impeach the credibility of defendant’s alibi witness by cross-examining her on her prior failure to come forward to exculpate her son. While we find the question put to defendant’s mother concerning her failure to tell her story to the Grand Jury io be somewhat suspect, we would not reverse defendant’s conviction on this ground alone. First, we note that defendant’s attorney specifically limited the grounds for his objection to his contention that "[tjhere is no legal responsibility * * * to attend the grand jury proceedings”. As has already been discussed, the mere fact that the witness had no legal obligation to come forward cannot serve as a basis for excluding this type of questioning. Inasmuch as defense counsel chose to limit the grounds for his objection to this single theory, we conclude that any other objection he may have had based upon the potentially misleading nature of the question was not preserved for review (CPL 470.05, subd 2). Moreover, even if the question had been preserved by a proper objection, we could not conclude on this record that reversal was warranted, since the witness herself provided eloquent explanation for her conduct when she said "I don’t know anything about the grand jury”. Under the circumstances, it cannot be said that the cross-examination was so misleading as to require reversal, particularly in the absence of a request by defendant for an appropriate curative instruction.
Defendant has also contended that his conviction should be reversed because the District Attorney made a number of improper comments during the course of his summation. These remarks, however, went without objection and, hence, any objection to their content is not preserved for our review (People v Williams, 46 NY2d 1070).
Accordingly, the order of the Appellate Division should be affirmed.

. To be distinguished, of course, are those situations in which a citizen’s cooperation is commanded or requested by law enforcement officials (see, e.g., United States v New York Tel. Co., 434 US 159, 175-176, n 24; Matter of Babington v Yellow Taxi Corp., 250 NY 14).

. The "Massachusetts rule” was laid down in Commonwealth v Kenney (12 Met [53 Mass] 235) and followed in Commonwealth v McDermott (123 Mass 440) and State v Bates (140 Conn 326; see, generally, Fisch, New York Evidence [2d ed], at p 461; McCormick, Evidence [2d ed], at pp 353-354).

. In contrast, in People v Rothschild (35 NY2d 355), we held that it was not improper for the People to cross-examine the defendant on his prior silence in an effort to impeach his testimony because, under the peculiar circumstances in that case, his silence was deemed to have particular probative worth. The defendant in that case was himself a police officer, and, in that connection, we observed: "The natural consequences of his status as a law enforcement officer would require him to promptly report any bribe or attempted bribe to his superiors” (id., at pp 360-361). Although the holding in Rothschild has been characterized as having been predicated upon the defendant’s special "duty” to speak, it is apparent that the existence of a "duty” in Rothschild was relevant only insofar as it lent probative significance to the defendant’s silence (People v Conyers, 49 NY2d 174, 178).

. In most cases, the District Attorney may lay a "proper foundation” for this type of cross-examination by first demonstrating that the witness was aware of the nature of the charges pending against the defendant, had reason to recognize that he possessed exculpatory information, had a reasonable motive for acting to exonerate the defendant and, finally, was familiar with the means to make such information available to law enforcement authorities.

. As a general rule, a potential witness has no right to have his or her testimony heard by a Grand Jury (CPL 190.50, subd 1). Under certain circumstances, a suspect who is being investigated by a Grand Jury may request that a particular person, designated by him, be called to testify before that body, although the Grand Jury is not obliged to grant the request (CPL 190.50, subd 6). In any event, since the burden for initiating such a request falls upon the defendant, it cannot be said that the witness’ failure to volunteer information to the Grand Jury is indicative of any lack of truthfulness in the witness’ story. Indeed, any attempt by the witness to volunteer information to the Grand Jury would be nothing more than a futile gesture in view of the statutory provisions.

. The members of a petit jury cannot be expected to be conversant with the statutory procedures governing Grand Jury appearances (see n 5, supra). Hence, it would be advisable for the Trial Judge, in addition to any other admonitions he *324 deems appropriate, to explain to the jury that a defense witness ordinarily has no opportunity to speak to a Grand Jury unless invited to do so by the District Attorney or the Grand Jury itself.