THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DWIGHT GADDY and WALTER GORDON, Appellants. — Appeals by defendants from two judgments (one as to each of them) of the Supreme Court, Kings County (De Lury, J.), both rendered March 16, 1981, convicting each of them of robbery in the first degree (two counts), upon jury verdicts, and imposing sentences. The appeals bring up for review, *inter alia,* the denial, after a hearing, of defendants' motions to suppress identification testimony. Cases remitted to the Supreme Court, Kings County, for further proceedings consistent herewith, and appeals held in abeyance in the interim. In the early morning hours of September 22, 1979, complainants Melvin Penn and his female companion, Kendall Russell, were robbed of jewelry and currency as they approached 251 Sterling Place in Brooklyn. Their assailants were five black teenagers, three of whom were armed. Shortly after the conclusion of the incident Penn and Russell walked three blocks to the 71st Precinct, where they reported the robbery. Two days later, on September 24, 1979, Detective Mack Ferguson, who had been assigned to the case, met Penn and Russell at the 71st Precinct

where they viewed photographs of potential suspects. The record contains contradictory testimony as to whether the complainants provided Ferguson with any physical descriptions of the robbers. According to Ferguson's testimony at the *Wade* hearing, he gave Penn and Russell two drawers, each one containing some 200 photographs of young black males, and inquired as to whether they recognized anyone. Penn and Russell were seated several feet apart at opposite ends of a table during this procedure and viewed the photographs separately. There was contradictory testimony as to whether both Penn and Russell, or Penn alone, selected several photographs. Penn showed his selections to Russell, who identified defendant Walter Gordon and told Penn that another photograph, that of defendant Dwight Gaddy, looked familiar to her. Russell testified that the final selection presented to Ferguson (which consisted of photographs of Gordon, Gaddy, codefendant Rex Dorsett, and one Evan Barton) was the product of a consensus between her and Penn. On October 8, 1979, Penn and Russell returned to the 71st Precinct to view a six-man lineup containing Gordon. They viewed the lineup separately, and did not converse. Ferguson did not tell them that any of the men whose photographs they had selected would be present. Rather, he told them only to see whether they recognized any of the participants, and to make an identification only if they were absolutely sure and "one hundred percent positive". Ferguson chose the five stand-ins for the lineup from a list of willing and available participants, without regard to their heights. Defendant Gordon held the number "1" and sat in the middle. Penn stated that all six participants were of similar height, hairstyle and skin color. However, he also stated that Gordon's shortness and youth made him easy to spot in the lineup. Penn made a positive identification of Gordon. Russell could not make a positive identification, but she stated she was 85% certain that Gordon was the robber who had taken her jewelry from her. However, her testimony at the *Wade* hearing discloses that her recollection of that robber's features, or of whether he was armed, was very confused. At that hearing, she was able, however, to make a positive in-court identification of Gordon. On October 27, 1979, at a separate lineup, Penn made a positive identification of Dorsett while Russell could not identify him. At a later lineup, on October 31, 1979, Penn made a positive identification of Gaddy, while Russell was once again only 85% certain. At the *Wade* hearing, Russell made a positive identification of Gaddy, while she was still unable to identify Dorsett. During the course of the *Wade* hearing, the court placed an arbitrary limit on the cross-examination of the People's witnesses. It also precluded defense counsel from cross-examining Penn regarding his viewing of a photograph of Gordon before he testified before the Grand Jury, and from cross-examining Russell regarding her viewing of a photograph of Gaddy before her hearing testimony. After the conclusion of the hearing, the court rendered an oral decision on the record. It first held that Russell should not be allowed to testify on direct examination as to her lineup identifications of Gaddy and Gordon since they were not positive identifications. It held, however, that she should be allowed to testify regarding the lineups if the defense "open[ed] the door" on cross-examination. It found, further, that the lineups were fairly conducted, that the seating of the participants minimized their differences in height, and that the police were not required to search further to find participants who more closely resembled defendants. It therefore held that Penn should be allowed to testify regarding his lineup identifications of defendants. It also held that both complainants should be allowed to identify defendants in court, since they had had a sufficient opportunity to observe them during the robbery. The case then proceeded to a jury trial. At trial, Penn identified all three defendants, while Russell identified Gaddy and Gordon, but not Dorsett. On cross-examination by defense counsel, both also testified

regarding the three lineups. During the jury's deliberations three notes were received by the court. A note, received on December 3, 1980, at 2:50 P.M. requested, *inter alia,* "2 pictures", which were apparently sent in to the jurors. Another note, received at 5:10 P.M. the same day, asked for the "names of people in lineups", whereupon the court first read the names and presented them to the jury in writing. A third note was received at 7:00 P.M. the same day. This note stated: "6:45 PM * * * If we, the jury come to a decision on *one* defendant, would that be accepted? One of the jurors feels it is too emotionally taxing to come to a decision. Can that one be replaced with the alternate juror?" The court concluded that "[t]he only reading of the note that one can come to is that the jury as of this time has not come to any verdict", and determined that the jury should be sent to dinner and a hotel for the night, and the question of substitution by the alternate decided in the morning. Defense counsel did not object. The following morning, each defense attorney refused to consent to such a substitution. Soon thereafter, the court received a note marked "10:55 A.M.", announcing that the jury had reached a verdict. The alternate juror was excused. Defendant Gordon's attorney moved for a mis-trial, on the ground that the jury should not have been allowed to continue deliberating under the circumstances. The other defense attorneys joined in his application. The court denied all three applications. The jury was brought into the courtroom and announced its verdict, convicting Gaddy and Gordon on both counts of robbery in the first degree, and acquitting Dorsett on both counts. The jurors were polled at the request of defendant Gordon's attorney, and the poll conformed with their verdict. At no time did defense counsel request that the court hold a hearing or make limited inquiry with respect to the contents of the third note. We believe that the court erred in one respect and, as a result, we lack a full record on the basis of which to adjudicate these appeals. Accordingly, the matter should be remitted to Criminal Term for a hearing, so that the record can be amplified, and the appeals will be held in abeyance in the interim. Criminal Term erred in placing an arbitrary time limit on each defense attorney's cross-examination of each witness at the *Wade* hearing. In view of the confused and contradictory testimony in the record regarding (1) what descriptions of the robbers, if any, were given by the victims to the police between the time of the robbery and the photographic viewings which occurred two days later, (2) the fact that the two victims were allowed to view the photographs together, allowing Penn to suggest identifica-tions to Russell and thereby influence her choices (see *People v Leite,* 52 AD2d 895; *People v Harris,* 74 AD2d 879; *People v Fernandez,* 82 AD2d 922), and (3) the question of suggestiveness raised by Penn's testimony regarding the October 8, 1979 lineup, it was incumbent upon the People to prove, by clear and convincing evidence, that Penn and Russell had an independent recollec-tion of the robbers predating this arguably suggestive photographic identifica-tion procedure (see *People v Ballott,* 20 NY2d 600). It was thus also incumbent upon the court to allow defense counsel to develop a full record on all these issues. By arbitrarily limiting the time it would allow for cross-examination, and also by precluding cross-examination of Penn and Russell regarding their viewing of photographs of defendants between the lineups and the *Wade* hearing, the court prevented the development of such a full record. As a result, we are unable to adjudicate defendants' claims regarding the court's denial of their suppression motions, and are compelled to remit the matter to Criminal Term for a *de novo Wade* hearing at which all issues regarding the identifica-tions of defendants Gordon and Gaddy by complainants Penn and Russell will be explored. However, Criminal Term did not, under the circumstances, abuse its discretion in denying defendants' motions for a mistrial (made after counsel acquired knowledge that the jury had reached a verdict) without first holding a

hearing to determine whether the juror referred to in the third note was qualified to participate in deliberations (see CPL 270.35, 470.05, subd 2; *People v Dawson,* 50 NY2d 311; cf. *People v Rivera,* 26 NY2d 304; *People v Gordon,* 77 AD2d 662; *People v Lawrence,* 78 AD2d 702). We reach no other issues. Gibbons, J. P., O'Connor, Rubin and Boyers, JJ., concur.