OPINION OF THE COURT
Michael A. Gary, J.
Defendant stands charged in an indictment with the offenses of robbery in the first degree (Penal Law § 160.15 [4]), unauthorized use of a vehicle (Penal Law § 165.08), criminal possession of stolen property in the fourth degree (Penal Law § 165.45 [5]), and two counts of grand larceny in the fourth degree (Penal Law § 155.30 [1], [8]).
THE FACTS
On September 20, 1994, at approximately 12:30 in the afternoon the female complaining witness accompanied by her small child walked from her home to her husband’s car, which was parked at the intersection of Avenue I and East 57th Street. She observed someone in the driver’s side of the vehicle and approached and knocked on the window. She saw a male wearing a white T-shirt and a baseball cap who pointed a handgun at her and she ran away with her child. After she ran, she saw the robber drive the car down Avenue I and turn on East 56th Street. Shortly thereafter, she called 911 and the police responded.
It is undisputed that in the initial police report of the crime (UF 61) filed in this case the complainant described the perpetrator as a male white in his 20’s, with no further physical description, wearing a white baseball cap and a white T-shirt and that there was no mistake made by the police officer in taking the report. It is also undisputed that all subsequent police reports filed with the court as part of the People’s Voluntary Disclosure Form describe the defendant as a male Hispanic.
After the police left, the complainant accompanied by her *634 husband and child decided to drive around the neighborhood in their other car looking for the stolen vehicle. Approximately five hours after the robbery, just before they were going to end their search, they turned onto Foster Avenue, and at the corner of Foster Avenue and East 56th Street, the complainant observed the stolen vehicle just inside the opened gate of a junkyard. The court takes judicial notice that this location is two blocks from the site of the robbery. The vehicle had been crushed and was being lifted by a crane onto a truck.
The complainant parked her car in front of the junkyard and while on her way to a pay phone to call the police she observed two males sitting in a car parked behind hers. One was in the back seat and the other was on the passenger side in the front; she recognized that individual as the person who robbed her. She called 911 again, the police responded and arrested the defendant. No evidence was presented to the Grand Jury concerning the recovery of any weapon.
The complainant was asked by the Grand Jury Assistant District Attorney (ADA) whether she saw anyone else arrested at the junkyard. The complainant responded that the owner or manager of the junkyard was also arrested. She was then asked the name of the individual and she stated it to the jury.
The defendant testified under a waiver of immunity through a Spanish interpreter. He has lived in this country only one and a half years and resides at 280 Jerome (no street or avenue). Police reports and the Criminal Justice Agency interview sheet reflect that the defendant came from Santo Domingo and that he has lived at 280 Jerome Street in Brooklyn one and a half years. The court takes judicial notice that 280 Jerome Street is approximately four miles from the scene of the robbery.
The defendant testified that he doesn’t understand English, he doesn’t know how to drive and is unfamiliar with the streets of New York. He stated that on the date of the robbery he woke up around 12:30 p.m. Around 2:30 p.m., Ramon Angeles, a family friend, asked the defendant to go with him and another individual in his car to various junkyards to find a part for his car. While Ramon Angeles went into a junkyard for the part, the defendant and his friend sat in the car. The police arrived and arrested him.
When the defendant arrived at the Grand Jury to testify, he was accompanied by three people whom he referred to in his *635 testimony: his mother, his cousin, and Ramon Angeles. Defense counsel notified the District Attorney’s office about these witnesses prior to the defendant’s testimony. These witnesses indicated they would be willing to speak to the Grand Jury ADA but wanted the attorney for the defendant to be present. Counsel was advised that the witnesses would be interviewed by the ADA only without counsel being present. The alibi witnesses did, in fact, speak to the ADA outside the presence of counsel. Mr. Angeles chose not to do so. When the Grand Jury specifically asked to hear Mr. Angeles’s testimony after the defendant had testified, the ADA would only allow the witness to testify under a waiver of immunity. Mr. Angeles was assigned 18b counsel for the purpose of his Grand Jury testimony, but the ADA never sought to interview him in the presence of his court-appointed attorney.
Ramon Angeles, described by defense counsel as a 37-year-old male Hispanic, testified under a waiver of immunity through a Spanish interpreter. The Grand Jury minutes reflect that he understood English but could not communicate his understanding of the waiver in English.
He testified that he was a mechanic who owned his own garage. He knew the defendant and his family for at least 10 years from Santo Domingo. The defendant’s home is in front of his garage. On the date in question, about 2:30 p.m., the witness called to the defendant and invited him to go with him to get a part to fix his car. A third individual, Edgar, also agreed to go for the ride. Mr. Angeles drove to about five or six junkyards. At the junkyard on Foster Avenue, the witness went into the junkyard, leaving the keys in the ignition so his passengers could listen to the radio while they waited. When he came out, he saw the police car approach and the police officer taking the defendant out of the car. Ramon Angeles testified that he asked the officers many times what his friend was being arrested for but they repeatedly told him to stand on the side because he had nothing to do with it. So he just stood there. He attempted to tell them that the defendant did not speak English. Finally, the two male and one female police officers present solicited his help in getting information about the defendant and a female officer told him what the defendant was being arrested for.
After being cross-examined by the ADA, the witness was excused and the following colloquy occurred:
"juror: Why does he have his lawyer here? Is he accused also?
*636 "ada: Please do not speculate as to why.
"juror: I understand.” (Grand Jury Minutes [GJM], at 26, lines 6-10.)
Mr. Angeles was recalled for further cross-examination by the ADA. The witness testified that he had not spoken to the defendant before 2:00 to 2:30 p.m. on the date in question, that the junkyard was about four or five miles from his garage, and that the defendant was not familiar with the streets. The ADA then returned again to the issue of when the witness first saw the defendant the day in question and ended that questioning as follows:
"Q. Was he with you the whole day?
"A. No, after 2:00 he was with me.
"Q. You don’t know what Mr. Batista did before that time, do you?
"A. No, I had not seen him.
"Q. In fact, you don’t know what he did prior to the time you actually saw him after that? [Sic.]
"A. No, because always in the morning he is sleeping. He gets up late. I knew he was there in his home.
"Q. As a matter of fact, you didn’t talk to him before that time?
"A. I had not spoken to him before.
"Q. You don’t know what he did before that?
"A. Before I called him I did not know what he had done earlier.” (GJM, at 35, line 11; at 36, line 1.)
No police officer was called to testify in this Grand Jury presentation which occurred on two dates, a week apart. At the jurors’ request the testimony of the complainant was reread by the Grand Jury stenographer. No evidence whatsoever was presented to this Grand Jury concerning the arrest of the junkyard owner, nor any evidence connecting the junkyard owner and the defendant. In fact, the People acknowledge that, on their own motion, the junkyard owner’s case was dismissed, without prejudice, in Criminal Court a month after this Grand Jury presentation.
THE MOTION TO DISMISS
In his omnibus motion, defendant attacks the integrity of the Grand Jury proceeding on a number of grounds. First, the defense contends that exculpatory evidence, the description of *637 the perpetrator on the UF 61 as a white male, was not presented to the Grand Jury. Second, the defense claims unfairness in the Grand Jury presentation in that the one defense witness the Grand Jury asked to hear was required to testify under a waiver of immunity. Specifically, defendant argues that the reason for requiring a waiver was in retaliation for the witness’s refusal to speak to the Grand Jury ADA without defense counsel being present. Defendant argues that "the result of having this witness testify under a waiver of immunity was to create an atmosphere of suspicion, that he was in some way involved in the theft of the complaining witnesses’ [sic] vehicle.” (Defendant’s motion, at 5.) Finally, defendant contends, upon information and belief, that the charge on the law was inaccurate, incomplete and misleading. This court declined to release any portion of the Grand Jury minutes to counsel.
In two supplemental responses to defendant’s omnibus motion, filed at the court’s request, the People clarified their responses to questions posed by the court at a January calendar call of the case when defendant and counsel were present. Though, in court, the People stated that they did not contest defense counsel’s statement of facts in the motion to dismiss, they argue that they met their burden in presenting the case to the Grand Jury, in that there was enough legally sufficient evidence presented for the Grand Jury to find reasonable cause to believe that defendant committed the crimes with which he is charged. Furthermore, they are not required to supply the Grand Jury with evidence to rebut the prosecutor’s presentation. The People defend the waiver of immunity by the defendant’s witness as a proper and prudent use of the discretion afforded them in the statutory procedure. Finally, the People contend that the Grand Jury was properly instructed on the law and that the integrity of the proceedings was unimpaired.
THE LAW
THE FAILURE TO PRESENT EXCULPATORY EVIDENCE
Defendant’s first argument for dismissal of the indictment, i.e., the People’s failure to present exculpatory evidence, seems compelling. Defense counsel argues that in this one-witness identification case the description of the perpetrator on the UF 61 as a white male cannot possibly refer to Jose Batista. Having observed the defendant, this court emphati *638 cally concurs. Nonetheless, the People are correct that the mere failure to present such exculpatory evidence to the Grand Jury is not fatal to the indictment. (See, People v Lancaster, 69 NY2d 20; People v Valles, 62 NY2d 36; People v Isla, 96 AD2d 789 [1st Dept 1983].)
angeles’s waiver of immunity
CPL 190.50 (4) sets forth the power of the District Attorney to require a witness called by the Grand Jury to waive immunity before testifying: "Notwithstanding the provisions of subdivision three, the district attorney may demand that any witness thus called at the instance of the grand jury sign a waiver of immunity pursuant to section 190.45 before being sworn, and upon such demand no oath may be administered to such witness unless and until he complies therewith.”
Preiser, Practice Commentaries (McKinney’s Cons Laws of NY, Book 11 A, CPL 190.50 [4], at 284) elaborated upon CPL 190.50 (4): "subdivision four, gives the district attorney the right to demand that the witness execute a waiver of immunity before giving evidence. This preserves the prosecutor’s control over who will receive the automatic immunity conferred by CPL § 190.40. Absent this provision, a lay body of grand jurors could immunize a suspect without consent of the People and without sufficient knowledge of, or even access to, all of the relevant facts. If a witness called at the request of the grand jury refuses to execute a waiver demanded by the People, the grand jury will not be permitted to hear the witness” (emphasis added).
In assessing the propriety of imposing a waiver, the District Attorney is held to an abuse of discretion standard. (See, People v Buszak, 185 AD2d 621 [4th Dept 1992] [where the refusal to grant immunity to defendant’s alibi witness, who refused to testify without it, was held not to be an abuse of discretion].) Interestingly, the case law proffered by the People to support their position only deals with a District Attorney’s discretionary use of immunity at trial. (See, People v Sapia, 41 NY2d 160, cert denied 434 US 823; People v Adams, 53 NY2d 241.)
In this case, the ADA assigned to prosecute this case at trial (hereinafter, the trial ADA) in his (supplemental) response dated January 20, 1995, stated that it was the "practice” of the District Attorney’s office to require a waiver of immunity from defense witnesses who would not talk to the Grand Jury *639 ADA without defense counsel present. Characterizing Angeles as an alibi witness, the trial ADA argued that: "this open refusal and confrontational posture left open the very real possibility that in the absence of a waiver, Angeles would testify as to his own complicity in the crime and suffer no consequence to himself. Furthermore, Angeles could even exculpate the defendant perhaps by asserting that he coerced defendant. This type of testimony would provide defendant with a defense, and again, Angeles would suffer no consequence.”
The trial ADA was thereupon directed by this court to furnish it with an affirmation from a supervisor in the Grand Jury Bureau. The affirmation was to set forth whether or not there was a written or unwritten "practice” or policy that an alibi witness testify under a waiver of immunity and under what circumstances. Also, whether there was any basis, or any evidence, admissible or inadmissible, to believe that the witness Ramon Angeles was a suspect in any criminal activity about which he was called to testify. Finally, the supervisor was to address the sufficiency of the Grand Jury ADA’s response to the juror’s question about Angeles’s testifying under a waiver.
A Deputy Bureau Chief of the Grand Jury Bureau filed a three-page affirmation in response to the court’s questions, dated February 13, 1995. Nowhere is there any mention of any practice or policy concerning alibi witnesses waiving immunity. However, the Deputy Bureau Chief affirmed that after consultation with the Grand Jury ADA he decided to require a waiver of immunity from Ramon Angeles for the following reasons: “1. defendant’s [sic] refusal to be interviewed by the Kings County District Attorney’s Office; 2. his presence with defendant at the auto salvage yard where defendant was arrested and where complainant’s auto was discovered; 3. to protect against the potential for Mr. Angeles to incriminate himself while immunized” (at 3).
Finally, as to the Grand Jury ADA’s response to the juror who inquired about the presence of counsel, the Deputy Bureau Chief explained that the response was appropriate in that further dialogue could have resulted in a misunderstanding by the grand juror.
At a calendar call of this case (on Feb. 21, 1995) after the Deputy Bureau Chiefs affirmation had been filed with the court, the trial ADA acknowledged that "there is no policy, *640 written or unwritten, that an alibi witness must go in under a waiver.” (Minutes, at 4.) While conceding that a witness’s cooperation, i.e., talking to the Grand Jury ADA before testifying, is a "main factor” in deciding if no waiver would be required, the final decision rests "on a case by case basis” with the Grand Jury supervisor. (Minutes, at 4-5.)
In an effort to clarify the People’s response on the . issue of whether Ramon Angeles was a suspect in any criminal activity about which he was called to testify, the following colloquy occurred at that same calendar call:
"the court: Now my third question was addressed to whether or not there was any basis, any evidence admissible or inadmissible, to believe that the defendant’s witness, that is Mr. Ramon Angelis [sic], was a subject — a suspect in any criminal activity about which he was called to testify.
"Now is it your representation that [the Deputy Bureau Chief] addressed that issue in his supplemental response?
"ada: I would have to take a look at it myself, your Honor.
"I do note that Mr. Angelis [sic] was not charged, was not arrested and, therefore, has no pending case in our office, at least arising out of the facts of the instant matter. However, he was with the defendant at the time the defendant was arrested at a location in which the alleged stolen property was discovered. That has not led to a subsequent indictment. So at this point I can’t say with any good faith, Judge, that he is a suspect.
"the court: Well, was he a suspect when he testified before the grand jury? That’s the issue. Was he in any way in good faith a suspect when he testified before the grand jury?
"ada: To my knowledge, no, your Honor. Because if he were a suspect, I take it that there would have been an interview which, obviously, never happened. If he were truly a suspect, there would have been further investigation, and there was none.” (GJM, at 7, line 5; at 8, line 8.)
In evaluating the People’s reasons for requiring a waiver of immunity for Mr. Angeles, the first reason given, his refusal to "cooperate” and be interviewed by the Grand Jury ADA outside the presence of defense counsel, is most untenable. The People argued that the implication of this refusal was that it raised the possibility the witness would implicate himself in the crime or provide a defense of coercion to the defendant. Logically, however, Mr. Angeles could have told one story to the Grand Jury ADA and a totally different story *641 to the Grand Jury itself. A prior interview with an ADA does not prevent that from happening. In fact, if the People truly feared such an occurrence, they would have a policy that every defense witness testify under a waiver. Moreover, if the presence of defense counsel was such a significant factor in their evaluation, it is to be noted here that the People chose not even to attempt an interview with Mr. Angeles in the presence of the court-appointed counsel they had obtained for him, before he testified.
Had this information been elicited at trial before a petit jury, the court would be required to instruct the jury that no negative inference could be drawn from Mr. Angeles’s "failure to come forward”. The People should not be allowed to exploit Angeles’s refusal to "cooperate” with them at this stage of the proceedings, by making him appear with an attorney, and under a waiver of immunity. (See, People v Dawson, 50 NY2d 311; 1 CJI[NY] 7.28.)
The second and third reasons given by the People for the waiver are not really separate and distinct. Only if the witness were linked to the crime would he be able to incriminate himself and be immunized. This is simply a restatement of the rationale for CPL 190.50 (4). By this statute the People are vested with the discretion to require immunity of any witness called by the Grand Jury because only the People at this stage of the proceeding would be expected to know or have access to all the relevant facts to determine if such a witness was a suspect. Yet, here the People concede that Ramon Angeles was never a suspect when he was called to testify by the Grand Jury.
Defense counsel contends that requiring a waiver by Mr. Angeles created an "atmosphere of suspicion” that he was somehow involved with the crimes charged against the defendant; thereby destroying the witness’s credibility before the Grand Jury in a case that boils down to the complaining witness’s word against the defendant’s. Indeed, the Grand Jury supervisor pointed to Mr. Angeles’s presence with the defendant at the time of his arrest, and at the junkyard where the stolen auto was recovered, as indicative of his involvement. Compounding this impression of guilt by association was the People’s introduction of evidence that the junkyard owner was also arrested in connection with this crime. Such evidence was never connected to the defendant, but this court finds that it certainly gave the Grand Jury the unmistakable impression that it was hearing evidence about a "chop shop” *642 operation, not a legitimate auto salvage yard. This prejudicial evidence certainly destroyed any impression that Mr. Angeles, a mechanic, might seek to convey as to why he and the defendant would be at the junkyard for a legitimate reason.
Finally, there can be no doubt that when the Grand Jury heard Mr. Angeles testify under a waiver of immunity, with his court-appointed attorney present, he appeared to be a suspect in the crime. Contrary to the People’s contention, this court finds under these circumstances the Grand Jury ADA was required to do more in the face of a juror’s questioning as to whether Angeles was also accused than simply telling the jurors not to speculate. Here, the grand jurors had just heard the testimony of the defendant who obviously testified under a waiver of immunity with his attorney present. Since the People characterized Mr. Angeles as an alibi witness and since they have no policy or practice as to when an alibi witness will have to waive immunity, there was nothing in these grand jurors’ experience to indicate that a witness who testifies under immunity before them could be anything but a suspect. Nor have the People argued anything to the contrary. Accordingly, this court finds that the People’s response to the grand juror’s inquiry did not cure the erroneous impression that Angeles himself was a suspect in this case.
This court finds the People did abuse their discretion when Mr. Angeles was required to testify under a waiver of immunity.
THE CHARGE TO THE GRAND JURY
This court has examined the Grand Jury minutes and finds the legal instructions given to be entirely proper and balanced except in one crucial respect. Only one reference was made to the testimony of Ramon Angeles and that reference was totally incorrect. Despite the witness’s repeated acknowledgements that he had not seen the defendant on the date in question until an hour and a half after the robbery occurred, the Grand Jury ADA nevertheless proceeded to instruct the grand jurors that they should consider the testimony of Ramon Angeles as an alibi witness: "You have also heard evidence from Ramon Angeles that the defendant was not present at 57th Street and Avenue I on September 26, 1994 at approximately 12 to 12:30 p.m. but was home and with him after 2:00 or 2:30 p.m. This is commonly known as alibi.” (GJM Book 4, at 6, line 22; at 67, line 2.)
*643 This court finds that this legal instruction, in the context of the witnesses’ actual testimony before the Grand Jury, was akin to setting up a "straw man”. Denominating Ramon Angeles an alibi witness after he testified repeatedly that he did not know where the defendant was at the time of the crime was tantamount to telling the grand jurors to disregard his testimony.
CONCLUSION
In the circumstances of this one-witness identification case, where the defendant’s testimony caused the Grand Jury to vote to hear from the witness Ramon Angeles, the cumulative errors committed by the People — presenting prejudicial evidence concerning the arrest of the junkyard owner, erroneously requiring the witness to testify under a waiver of immunity and erroneously charging the Grand Jury as to how to evaluate his testimony — all combined to impair the integrity of the Grand Jury proceeding such that prejudice to the defendant may have resulted. (See, CPL 210.35 [5].) While the People may properly refrain from presenting exculpatory evidence to a Grand Jury, they may not frustrate the defendant’s attempt to do so. Accordingly, defendant’s motion to dismiss the indictment is granted. As this court finds no evidence of bad faith in the People’s presentation, their request in their initial response to defendant’s omnibus motion for authorization to resubmit the charges to another Grand Jury is granted. (See, CPL 210.45 [9].)
In light of the foregoing, the other aspects of defendant’s omnibus motion have not been addressed.