Antonio MATTHEWS, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CF–432.

District of Columbia Court of Appeals.

Argued Dec. 1, 2005.

Decided Jan. 19, 2006.

Thomas D. Engle, with whom Sharon L. Burka, was on the brief, for appellant.

Youli Lee, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Elizabeth Trosman, Tricia D. Francis, Toni B. Florence, and Miriam A. Valoy, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and GLICKMAN, Associate Judges, and FERREN, Senior Judge.

GLICKMAN, Associate Judge:

Antonio Matthews was convicted after a trial by jury of armed carjacking, armed robbery (in connection with the taking of a purse belonging to the victim of the carjacking), unauthorized use of a vehicle, two counts of possession of a firearm during a crime of violence (PFCV), and carrying a dangerous weapon (CDW). Matthews's principal contention on appeal is that the trial court abused its discretion by allowing the government, over his objection, to impeach one of his alibi witnesses with her failure to furnish her exculpating information to law enforcement authorities before trial. Matthews also contends that his two PFCV convictions merge with each other and with his CDW conviction. We conclude that the error, if any, in permitting improper cross-examination of the alibi witness was harmless, and that the two PFCV convictions merge with each other but not with the CDW conviction. We therefore affirm the judgment on appeal, except that we remand for the trial court to vacate one of the duplicative PFCV convictions.

## I.

At approximately 9:40 p.m. on the evening of May 2, 2002, three armed individuals accosted Lakisha Johnson on the street and forced her to relinquish the keys to her Chevy Tahoe truck parked nearby. The robbers, two men and a woman, entered the truck and were about to drive off when Ms. Johnson asked them for her purse, which she had left in the vehicle behind the passenger seat. One of the men started to hand the purse to her, but the second man directed him not to do so. The robbers then drove off with the purse.

Police stopped the truck the following day and arrested its three occupants, one of whom, sitting in a passenger seat, was appellant Matthews. At the police station a day later, Ms. Johnson identified Matthews from a photo array as the man who had held a gun to her head, snatched the car keys from her hand, and drove off in her vehicle. Ms. Johnson also made an in-court identification of Matthews at trial. According to Ms. Johnson, it was Matthews who told the other male robber not to give her back her purse.

Matthews presented an alibi defense at trial, relying on the testimony of his grandmother, aunt, and cousin that he was at home with them throughout the evening of May 2, 2002. The alibi witnesses particularly recollected receiving a telephone call that evening from Akina Jackson, the girlfriend of Matthews's brother. As Geraldine Clark, Matthews's grandmother, explained it, Ms. Jackson was at Columbia Hospital, having just given birth, and the family was waiting for her call to see if she was coming home that evening. In her call, which the witnesses described as having lasted about an hour, Ms. Jackson reportedly said that she and the baby, who had been born prematurely, had to stay in the hospital until the next day, i.e., May 3, 2002.

In rebuttal, the government called Akina Jackson herself. Ms. Jackson testified that she actually gave birth on April 29 (which the government corroborated with the baby's birth certificate), and that she left the hospital on May 1, 2002.

## II.

██ Matthews's grandmother, Ms. Clark, was the first alibi witness to testify at trial. At the beginning of Ms. Clark's cross-examination, the prosecutor sought leave of court to impeach her with her failure, when she attended Matthews's May 7 pretrial detention hearing, to tell the police or the prosecutor that she could furnish an alibi for her grandson. Balanc-

ing considerations of prejudice and probative value, the trial judge declined to allow mention of Matthews's pretrial detention but otherwise permitted the prosecutor, over defense objection,[1] to pursue the impeachment. In the ensuing cross-examination, Ms. Clark acknowledged that, while she was in court with Matthews for a hearing in this case on May 7, she did not take the opportunity to tell the police or the prosecutor that Matthews was home with her on the night of May 2. However, she testified, "I told Ms. Williams—his attorney." The prosecutor did not challenge or explore that answer. Ms. Clark reiterated it on redirect, adding that she told Ms. Williams about her grandson's alibi "after he got locked up and they appointed her to be his lawyer." The matter was not mentioned again during the trial.[2]

"Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). Silence in those circumstances is akin to a prior inconsistent statement. Applying that principle, this and other courts have held it proper for the trial court to allow cross-examination of a defense witness about his or her prior failure to bring an alibi or other exculpatory information to the attention of law enforcement. *Cain v. United States*, 532 A.2d 1001, 1006 (D.C.1987) ("[S]uch questioning amounts to no more and no less than testing the credibility of the witness."); *accord, Morris v. United States*, 622 A.2d 1116, 1125 (D.C. 1993). *See generally* Milton Roberts, Annotation, *Impeachment of Defense Witness in Criminal Case by Showing Witness' Prior Silence or Failure or Refusal to Testify*, 20 A.L.R.4th 245, § 9 (1983).

 However, such cross-examination "is permissible only where the circumstances are such that the witness' normal and natural course of conduct would have been to go to the authorities and furnish the exculpatory information." *Alexander v. United States*, 718 A.2d 137, 143 (D.C. 1998).[3] Typically, this threshold is viewed

---

1. Defense counsel argued that "to say she [Ms. Clark] ha[d] some obligation to come forward ... runs counter to the case law," and that the proposed impeachment would "give[ ] the jury a misimpression about whether or not this woman was diligent in doing all that she could to bring the information that was available to her to—to whomever she thought should have it." Although the transcript is somewhat garbled, it appears that counsel represented to the court that Ms. Clark had informed Ms. Williams, Matthews's previous counsel, of the alibi before the detention hearing. The prosecutor questioned the truth of that assertion, noting that the only witness Ms. Williams called to testify at the detention hearing was "the co-defendant."

2. The prosecutor did not question either of Matthews's other alibi witnesses about their failure to bring the alibi to the attention of the authorities, and neither counsel alluded to Ms. Clark's impeachment during closing arguments.

3. As with impeachment generally, the prosecutor is required to lay a proper foundation. For impeachment by silence of the kind we are now discussing, this may be accomplished, under the majority view, "by first demonstrating that the witness was aware of the nature of the charges pending against the defendant, had reason to recognize that he possessed exculpatory information, had a reasonable motive for acting to exonerate the defendant and, finally, was familiar with the means to make such information available to law enforcement authorities." *People v. Dawson*, 50 N.Y.2d 311, 428 N.Y.S.2d 914, 406 N.E.2d 771, 777 n. 4 (1980); *cf. Davis v. State*, 344 Md. 331, 686 A.2d 1083, 1090 (1996) (holding that to inquire into the alibi witness's pretrial silence, the prosecutor need only establish "that the relationship between the witness and the defendant is such that the witness would have a natural tendency to disclose the exculpatory evidence he or she possessed to the proper authorities," leaving

as depending primarily on the existence of a close relationship between the witness and the defendant. *Davis, supra* footnote 3, 686 A.2d at 1089–90; *see, e.g., Cain,* 532 A.2d at 1006 (questioning held "especially" probative of credibility where witness and defendant were father and son and lived together).

 Ms. Clark's relationship with Matthews was undeniably close enough to satisfy the foundational prerequisites for her impeachment. Her "normal and natural course of conduct," *Alexander, supra,* surely would have been to report her exculpating information immediately in order to prevent Matthews from being prosecuted (and, even more pressingly, to secure his release from incarceration). There was, however, a countervailing consideration here for the trial court to ponder before permitting the inquiry into Ms. Clark's silence. Although she was present when her grandson was arrested, Ms. Clark evidently did not learn that he was charged with crimes that were committed on the evening of May 2 until later, after Matthews was appointed counsel. It was only then that she would have had reason to know that she could furnish an alibi for him.[4] Our case law has embraced the view that, where the witness knows that the defendant is represented by counsel, "no

inference [of fabricated testimony] can be drawn" from the alibi witness's failure to inform the authorities of the information in her possession, because the witness "might reasonably presume that it was sufficient for him to relate his knowledge to the attorney retained or appointed to represent [the] defendant." *Alexander,* 718 A.2d at 143 (quoting *United States v. Young,* 150 U.S.App.D.C. 98, 102, 463 F.2d 934, 938 (1972)).[5] In other words, once the alibi witness has furnished her exculpatory information to defense counsel (as Ms. Clark allegedly did here), it arguably can no longer be maintained that her "normal and natural course of conduct would have been to go to the authorities" with the information, as *Alexander* requires. Where that is so, it is incumbent on the trial court to "consider carefully on the record before it whether the line of questioning at issue ... is sufficiently probative to justify in the face of objection its use in determining the witness' credibility." *Id.* at 144.

In light of our admonitions in *Alexander,* the prosecutor in this case arguably should have been precluded from impeaching Ms. Clark with her failure to tell the authorities that her grandson could not have committed the crimes with which he was charged because he was at home with

other factors for the defense to elicit if it so desires).

4. Thus, importantly, the alibi witness here was unlike the mother hypothesized by the Supreme Court of New Jersey, "whose son is wrongly arrested in her home on charges of an armed robbery alleged to have occurred at 4:00 p.m. that same day," and who "would likely tell the police [at the time of the arrest, before any lawyer is involved] if her son had been in her home at that time and is unjustly accused." *State v. Silva,* 131 N.J. 438, 621 A.2d 17, 21 (1993).

5. Other courts have been unwilling to adopt Judge Leventhal's rationale in *Young. See,*

*e.g., Commonwealth v. Brown,* 11 Mass.App. Ct. 288, 416 N.E.2d 218, 224 (1981) (stating that impeachment may be pursued if the prosecutor shows "that the defendant or his lawyer, or both, did not ask the witness to refrain from" conveying her exculpatory information to the authorities); *Dawson,* 406 N.E.2d at 778 (stating that when the cross-examination begins, the trial judge "should call a bench conference to ascertain whether the witness refrained from speaking under the advice of defense counsel, for in such a case examination on the issue of the witness' postconsultation silence would be improper and could well result in a mistrial"); *see also Silva,* 621 A.2d at 22.

her. We are mindful, though, that the decision whether to allow the impeachment was committed to the sound discretion of the experienced trial judge, and notwithstanding precedent, we think the question of error in this case is a debatable one. After all, the witness was free to explain why she did not go to the authorities. *See, e.g., Dawson,* 406 N.E.2d at 777–78. If, for example, Ms. Clark "presume[d] that it was sufficient for [her] to relate [her] knowledge to the attorney retained or appointed to represent [the] defendant," *Young, supra,* nothing stopped her from saying so. It is not obvious that the jury would have been unable to evaluate such an explanation fairly, and without veering off into inappropriate matters.[6]

■ We need not decide whether discretion was· exercised correctly in this case, however, for even if error be posited, we can say with "fair assurance" that the jury's verdict "was not substantially swayed" by it. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Considering that Matthews was caught sitting inside Ms. John-

son's truck the day after it was stolen, and that Ms. Johnson identified him as one of her assailants from his photograph the very next day, and in person at trial, we think the government's case was a strong one. We also think that the impeachment in question did not seriously damage Ms. Clark's credibility, since she testified without contradiction that she communicated the alibi information promptly to Matthews's first defense counsel, the prosecutor did not dispute that claim, and the impeachment then was dropped and not mentioned in closing argument. What did seriously undermine Ms. Clark's credibility, and the entire alibi defense in our view, was Ms. Jackson's unequivocal testimony on rebuttal, which powerfully demonstrated that the alibi witnesses were not recounting what happened on the evening of May 2. Finally, it does not appear that the questioning of Ms. Clark conveyed any impression to the jury that the defense had instructed Ms. Clark to withhold Matthews's alibi from the government or otherwise had engaged in concealment. We therefore do not perceive any likelihood

---

**6.** Potentially troublesome issues would have been presented, however, if the prosecutor had sought and been allowed to probe how, or how promptly, Ms. Clark provided her information to defense counsel. For example, such questioning, which presumably would have been designed to show that the alibi was a recent fabrication, might have created a need for defense counsel to testify for purposes of rehabilitating the witness. *See Silva,* 621 A.2d at 23 ("A prosecutor who cross-examines a witness about an unwillingness to discuss the case with the State's investigator will have to accept the introduction of prior consistent statements made to others that rehabilitate the original testimony."). Further questioning also might have run the risk of conveying to the jury the prejudicial and (especially in light of the notice-of-alibi provisions of Superior Court Criminal Rule 12.1) improper implication that the defense had wrongfully concealed the alibi from the prosecution.

Highly undesirable possibilities such as these are some of the considerations a trial judge should weigh in evaluating a prosecution request to cross-examine a defense witness with her failure to go to the authorities. The trial judge has discretion to limit such cross-examination if its probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Johnson v. United States,* 683 A.2d 1087, 1099 (D.C.1996) (en banc) (adopting the policy set forth in Federal Rule of Evidence 403 for the admission of evidence generally); *Springer v. United States,* 388 A.2d 846, 854–55 (D.C.1978) (noting that the extent of cross-examination "is within the sound discretion of the trial court," and listing a number of proper reasons for the court to limit cross-examination) (quoting *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931)).

that the impeachment distracted the jury from properly focusing on the evidence. These considerations convince us that, even if Ms. Clark had not been impeached with her silence, the jury still would have returned the same verdicts of guilty that it did.

## III.

██ The predicate felonies for Matthews's two PFCV convictions were armed carjacking and armed robbery. Because carjacking and robbery each requires proof of a factual element that the other does not, Matthews's two predicate felony convictions do not merge. *Pixley v. United States*, 692 A.2d 438, 440 (D.C.1997). The general rule when the convictions for the predicate crimes do not merge is that the associated PFCV convictions do not merge either. *Stevenson v. United States*, 760 A.2d 1034, 1035 (D.C.2000).

██ We have, however, fashioned a "limited exception" to this general rule. *Id.* at 1036. Applying the rule of lenity, we held in *Nixon v. United States*, 730 A.2d 145, 153 (D.C.1999), that multiple PFCV convictions will merge, even if the predicate felony offenses do not merge, if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence. Thus, in *Nixon*, we held that three PFCV convictions merged into one because the predicate offenses of assault with intent to kill, aggravated assault, and mayhem (all while armed) were committed essentially simultaneously in a single act of violence.[7] *Id.* In contrast, in *Stevenson* we held that two PFCV convictions did not merge, even though they were based on the continuous possession of a single firearm, because the predicate offenses of burglary and robbery

did not constitute a single violent act, but rather were two "distinct acts" that were committed seriatim. *Id.*, 760 A.2d at 1036. The burglary was complete when the perpetrators entered the targeted store with criminal intent, while the robbery "was not even begun until the perpetrators had been in the store for some period of time. . . ." *Id.* Accord, *Bailey v. United States*, 831 A.2d 973, 988 (D.C.2003).

██ To determine whether two PFCV convictions are based on a single act of violence or distinct acts, we adopted the so-called "fresh impulse" or "fork-in-the-road" test: "If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then his successive intentions make him subject to cumulative punishment. . . ." *Stevenson*, 760 A.2d at 1037 (citations omitted). In other words, " '[e]ach time the defendant commits an independent violent crime, a separate decision is made whether or not to possess the firearm during that crime,' " thereby exposing the defendant to a separate, additional conviction of PFCV. *Id.* (quoting *Hanna v. United States*, 666 A.2d 845, 855 n. 12 (D.C.1995)).

Matthews argues that under *Nixon*, his two PFCV convictions merge because the taking of Ms. Johnson's purse by armed robbery was "incidental to the carjacking and part of the same act," in that he "gained possession of the purse by gaining possession of the vehicle." "There was," Matthews asserts, "no 'fork in the road' where he elected to take possession of the purse after having taken possession of the vehicle." The government differs with that view of the evidence, arguing that

---

7. The convictions for aggravated assault and mayhem merged with each other but not with assault with intent to kill.

Matthews came to a "fork in the road" when he "went out of his way" to stop his confederate from returning Ms. Johnson's purse to her when she asked for it. At that point, the government reasons, Matthews "was presented with a choice—either give Ms. Johnson her purse or take it, along with the vehicle—and he can no longer claim that taking the purse was simply incidental to taking the vehicle." Because "taking the purse and the car were two separate and distinct events," the government concludes, the two PFCV convictions "do not arise out of a simultaneous action" and hence do not merge.

The government's argument rests on the unstated assumption that, unlike the carjacking, the armed robbery was not yet complete when Matthews instructed his confederate to keep Ms. Johnson's purse, because an essential element of robbery (but not of carjacking) is asportation, or carrying the stolen property away. *See Pixley,* 692 A.2d at 440.[8] Even assuming that is so, the fact remains that in contrast to the predicate crimes in such cases as *Stevenson* and *Hanna,* the two predicate felonies in this case overlapped substantially and were not independent of each other. But for the rather technical matter of asportation, the taking of the vehicle and the taking of its contents, including the purse, were commenced simultaneously and were effectuated by the same violent act against Ms. Johnson. If the carjacking and the armed robbery were not wholly simultaneous, they were nearly so.

The question of merger is, therefore, a close one. The logic of the government's position, however, threatens to erode the *Nixon* exception to dust. In that very case, after all, the predicate offenses—assault with intent to kill and either aggravated assault or mayhem—were not necessarily completed at exactly the same time. The assault with intent to kill was, or easily could have been, completed first, since the other two offenses required not only an assault (with its accompanying intent) but also the infliction of "serious bodily injury." *Nixon,* 730 A.2d at 152. One who begins an assault with the intent to kill—a completed offense in itself—could (often, if not always) desist before inflicting such injury. But instead of analyzing the facts before it in that way, the *Nixon* court viewed the criminal transaction as a continuous whole. Thus, in the case now before us, we think it more faithful to *Nixon,* and compatible with our other precedents, to hold that because the predicate robbery and carjacking began at the same time and were committed together by means of the same act of violence involving the same weapon, the two PFCV convictions associated with those felonies merge even though the asportation element of the robbery may not have been satisfied until shortly after the carjacking was completed.

 Matthews's remaining contention, that his PFCV conviction merges with his CDW conviction, must be rejected. "Absent a clear indication of contrary legisla-

---

8. It perhaps could be argued, however, that the element of asportation was satisfied before Matthews intervened to keep the purse, either when Ms. Johnson relinquished her keys to the vehicle that contained her purse, or when Matthews's accomplice picked up Ms. Johnson's purse in response to her request for it. *See Newman v. United States,* 705 A.2d 246, 264 (D.C.1997) (holding that a "minimal movement of the property—throw-ing the money to the floor at appellants' direction—satisfie[d] both the taking and asportation requirements" of robbery, even though the appellants never touched the money); *Lattimore v. United States,* 684 A.2d 357, 360 & 360 n. 4 (D.C.1996) ("[T]he slightest moving of an object from its original location may constitute an asportation.") (internal quotation marks and citations omitted).

tive intent," we apply the *Blockburger*[9] test under which two offenses do not merge if each requires proof of an element that the other does not. *Pixley*, 692 A.2d at 439. That is the case here. PFCV requires proof that the defendant possessed a firearm *"while committing a crime of violence or dangerous crime,"* D.C.Code § 22–4504(b) (2001) (italics added), which CDW does not. CDW requires proof, inter alia, that the defendant *carried* the weapon on or about his person, a more stringent requirement than the mere (actual or constructive) *possession* that suffices for PFCV. *See White v. United States*, 714 A.2d 115, 119 (D.C.1998). Moreover, the available evidence indicates a legislative intent that the two offenses not merge. *See Ray v. United States*, 620 A.2d 860, 864 (D.C.1993) (examining legislative history and holding that convictions for PFCV and carrying a pistol without a license (CPWL)[10] do not merge).

## IV.

For the foregoing reasons, we affirm the judgment on appeal, except that we remand for the trial court to vacate Matthews's conviction on one of the PFCV counts.

---

**9.** *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**10.** CPWL is proscribed by the same section of the D.C.Code as CDW, § 22–4504(a).